May it please the court? My name is Deanne Casperson, and I'm here on behalf of the appellant, Rodney Burch. May I please reserve four minutes for rebuttal? Thank you. In this case, the district court granted summary judgment, and it did so in violation of the summary judgment standards. Probably these words that all of us have said a million times, genuine issues of material fact, viewing the lights in the light, or viewing the evidence in the light of the non-moving party. Well, but I don't know, counsel. I mean, it doesn't seem like there's really much dispute about the facts. It seems like the dispute is what relevance do those facts have under free speech law and specifically retaliation claims? Well, I think when you look actually at what the court did, and probably the most egregious area, maybe I start there. If you look at what the court found on the third pickering factor, which is, is there, was the adverse action motivated by the speech? And in that case, what we have, of course, if you will remember the facts, is that Mr. Burch wanted a city governance that we would have a city administrator, because he was concerned about the mayor's performance, and he was advocating for that, and he was doing so in discussions, not with the whole council, but just with certain members of the council, and then he addressed it with the mayor as well. And then after the mayor rejected that, he decided to support the opposing candidate, Dan Heiner, who was also a council member, too. But all, none of that's disputed. None of that is, well, none of that is really disputed. Where it gets to, what the question was, what motivated these adverse actions? Right, but to me, that motivation, is motivation a fact? I mean, I guess you're pitching motivation as a factual issue. It seems to me, motivation is, we have these facts set, and then the judges, the judge draws the inference of, well, was that the, was that the motivation for the speech? Well, if you look back to that factor in Ng, it's specifically a question of fact. And the court goes forward and says, oh, it wasn't the support of Heiner that motivated these adverse actions. It was the June 1st memo where he criticized the mayor, and that's what did it. But that is a jury question. That is not for the court to decide. And when you look at the decision, we have, now, that's the most egregious. I don't have any other fact-finding that I can point out to you other than that one. But what we do have is, throughout the opinion, these inferences- But it seems to me, counsel, that the district judge assumes an adverse employment action under the Ng factor. And then moves on. The district court assumed it, gave it to you, an adverse employment action, and even assumed a substantial motivating factor. They said the, they said the sign was not a substantial motivating factor, but so, so what we're really looking at is, they assumed that under the Ng factor, and then moved to the fourth Ng factor, suggesting that the state's legitimate administrative interests outweigh the First Amendment rights. That's what I thought the court did. Well, the court does get to the fourth factor, which- I mean, he goes so far as to say, the court, the balance of interest test justifies the action taken by the city of Chubbuck. That's what the court says, and that's a legal question. Well, it, that part, that, that question- And if that's the way it is, then it outweighs the adverse employment action under the test. It does what to the adverse employment action? Outweighs the adverse employment action. Well, it, it might. I mean- I mean, it can. That's what you're doing. That's how you're doing it. When you, when you apply the retaliation factors, and you get to the third Ng factor, you have, you've still got the burden of proof on the third Ng factor.  And you have it on the, as we turn to the fourth Ng factor, then the government's got the burden of proof, and the court looked at the fourth, and a legal question was addressed, and the court says, the balance of interest test justified the action taken by the city of Chubbuck. Well, it's a mixed question of laws. That's what's mixed about it. Because the underlying issue, though- I mean, the, the, the, if you will, the fact question is that question that would come out under the third Ng factor, adverse employment action. And they gave that to you. I mean, they didn't go as far as to say the sign was, but they said, so what? The balance of interest justified the action taken, regardless of what the sign did. That's what the district court said. But even if you look at that fourth factor, that basically says, number one, it's the Pickering balancing test is what we're talking about. And defendant made no argument with regard to that, and yet the court went ahead and said that they had applied that. But here's the fact that just gets me on that. The city council already decided as to whether he should be fired or not. The mayor took that same June 1st letter and he testified that he gave that to the city council and used it to try to get Birch fired, and the city council rejected it. So how can they even argue that this was so disruptive that the balancing of the factors required any adverse employment action that happened when the city council rejected it? I would like to step back if I could. I looked at your complaint. First of all, we have to have a protected action. And the protected action in any one of these cases is, if we look very seriously at the statute, the protection action is the fact of saying something about it, of doing, of saying. So I looked at your complaint. What are the protective actions you're talking about here? We have expressed wasteful actions occurring in the city at the city council meetings. We have placed a sign in his yard to support another candidate for mayor. We have met with the mayor and expressed concerns and differences, and we have submitted his letter of resignation to explain why he had no choice but to resign. Those are the four allegations you suggest in the complaint. It seems to me that other than placing the sign in his yard, every one of those others, really, your client was not acting outside of his employment definition. He gave, he expressed the wasteful actions to the city at the city council. That was to the city council. He met with the mayor. That was the mayor. He submitted the resignation. He did it as the way it was supposed to be done, as per the city. So I don't find that he did anything in those other three allegations, which are anything but being right according to his duties. So he is the public works director, right? So he's overseeing water, sanitation, those departments within the city. When he starts proposing the city administrator, that is not something within his duties. Now, I understand that you're saying, well, but he took that to the mayor. But he never took that. Just a minute. He took it, first of all, he'd done this before. He came up with a city plan the same way. Went over and saw his compatriot. And then he takes it to the mayor and the city council. He does this the same way. Well, he did the strategic plan. And I want to say that, honestly, he was stepping in and covering for the mayor. Because they never had a strategic plan. And the mayor wasn't doing any of this. That's your good argument. But not every city has a strategic plan. Sure, they don't. I mean, maybe Idaho Falls does. But I live down there. And I know there's not many who do. And Birch is an exceptional employee. He's very talented. And he worked to put this together. And he got it approved by the city council. Because he didn't normally attend city council. He didn't normally report to them. That was an exception. Because he had done so much work on the strategic plan. But he testified that once he got it done, he turned it over to the mayor. Because that's who was supposed to see that the city was following that. But the mayor is his direct supervisor, right? He is. And we- So if he presents a recommendation that the form of city government be changed from strong mayor to strong administrator, why is that not within the scope of his duties as the director of public works when he has direct reporting responsibility to the mayor? Well, I think, number one, you've got to see that he's talking to individual city council members first about this idea of a city administrator position. And he doesn't have a duty to report to the city council. Well, it's a little murkier than that, Ms. Casterson. It has to do with the fact that the city council is the otherwise overall approving authority. They have to approve his hire. And they also have to approve his firing. They do, but- And so there is some oversight by the council of, what are there, six directors of departments in the city? Yes. So he's pretty high up in terms of city government. He is. But he doesn't have that typical reporting. Like, he doesn't provide input to the city council for the mayor's evaluation. He's never done any of that. He doesn't regularly go to city council meetings. So when he's talking to these- But he was doing that with the knowledge of the mayor, right? I mean, the mayor was blessing us, saying, go ahead and do this. Not after. There was a- But your complaint doesn't say that. Your complaint says that late spring, early summer of 2029, 2021, Birch began communicating in work sessions and city council meetings with the mayor and the city council in good faith. And- The existence of the waste of the public funds and property and the violations. So the complaint doesn't suggest he's acting outside of his duty. The complaint suggests he's doing it as he has always done, in good faith, in work sessions and with the city council. And that's inaccurate in terms of the meetings. But it's not a verified complaint. I understand, but I don't have you in here. I just read what you write. No, I understand. But what the evidence- Your point is the facts are different and this is on summary judgment. Yes, yes. I mean- Well, okay. Yeah, I mean, did we inadvertently say meetings instead of having- You know, it wasn't a city council meeting. It's individual meetings that he's having with certain council members to advocate for this. What affidavit contradicts this complaint? Because I look for one. His testimony in his deposition? Well, the testimony that he comes up with in order to come up with something to say may suggest that he didn't have the ability to do it. But he also says he worked under the direction of the mayor and the city council. That under the job description, he works under the direction of the mayor and the city council. I mean, as I go through and I read all this, I have a tough time. Well, but you have to read his deposition testimony where he was specifically asked if he ever reported to the city council. And other than the strategic plan or if he was invited to come, he had no role to go to the city council. And the struggle I have a little bit with it is when you go back to Garcetti and you look about the public employees don't lose those First Amendment rights just because they work for a governmental employer. Who do you go to other than- The city council and reporting to those above you and only making it to those that are in the chain of command, not alleged to be taken outside the workplace. The speech was within his responsibilities as a city employee. It did not contravene the directions of his supervisors. All of that makes it such that it isn't public speech whatsoever. Or it isn't private speech whatsoever. How is Birch proposing a city administrator within his role as the public works director? This is- he's not required to do that. That is something that the city council or the mayor could do. That's not within his job descriptions. It's not listed there anywhere. He doesn't have any responsibility for the strategic plan. Well, to be fair, neither is the strategic plan listed in his job duties. It's not. And the problem is is that we don't dispute- And the trouble is it's Chubbuck. And it's not necessarily strict, exact. So we have to read between the lines to see what he could do and what he could not do. And then we have to think, was it made only within his chain of demand? Was it outside of his workplace? Was it within his responsibilities? Did it contravene the direction of the mayor? None of those work. It- he did contravene. The mayor, after he said he didn't want to do it anymore, one of the council members wrote him an email and said, hey, I intend to send this to the mayor. Will you give me some input on it? And he did. Even though he had told the mayor that he would stop- he did stop advocating for it with the mayor, but he didn't stop advocating for it outside of that. And that is the struggle that we have is those inferences that should have gone in his favor did not. I see that my time is up. Are there any more questions before I come back on rebuttal? We'll give you a couple of minutes for rebuttal. Thank you. May it please the court, counsel. My name is Sam Angel. I represent the city of Chubbuck. As the courts picked up on, this case involves really what was a policy dispute between the public works director and the mayor. Rodney Birch in 2021 decided that he thought the city of Chubbuck would be better run if they had a city administrator. And he brought that concern directly to the mayor. I think the courts picked up that his background- It wasn't within his job description, right? Within his job description? What was not within? The advocating for the city administrator position. I mean, he was public works, right? Correct. He was a public works director. He was a department head. He was one of the top officials. But no, nothing in his job description said you will advocate or not advocate for a city administrator position. It's an uncommon form of government in Idaho. It doesn't happen very often. There's two ways you can do it. One is that the mayor can voluntarily decide he wants to hire a city administrator. Or two, the city council can vote and impose it by statute on the mayor and effectively remove the- I mean, doesn't that go to your opposing counsel's argument that this was outside? And therefore, that's what made this a protected speech. Yeah, I get that that's their argument. But I would just ask this court to look back at what the Supreme Court has said on that. The Supreme Court, in the Garcetti v. Zabala's case, addressed that. The wording that the Supreme Court uses is official duties. The Supreme Court doesn't say job description. What they say is, we hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline. How do we draw that line? Because if you're saying it's not job description, which may be correct, where does it go beyond? I mean, why does a yard sign become out? I mean, you agree that putting up a yard sign is protected speech, right? For sure, yeah. Okay, so what's the difference between that and something else that isn't in his- whether it's his job description? Is it because the mayor, in your view, like blessed this endeavor? Is that what makes this official duty? Let me see if I can answer- I thought I'd get this question. Maybe my answer to the question is that this court gets to decide that. No, you've got to tell us what you want us to decide. But the way I would answer is this. Courts have to categorize speech at some level to decide- I agree, and Garcetti, I appreciate what you read. I'm not sure it helps us. The courts have to categorize it in some general categories. The way they've done that is private speech and public official duty speech. So, to the specific issue of did asking for a city administrator fall within one of the other of those categories, we have factors that we look at to determine that. I would ask this court to look at some of the other Supreme Court and Ninth Circuit decisions that clearly identify what is protected private speech. Okay, so what- yeah. Yard sign. Putting a yard sign up in your yard ahead of an election is, absolutely. Writing an op-ed in the newspaper, complaining and pickering, complaining about the pay of school teachers is. Dodge versus Wintergreen, wearing a MAGA hat, apparently, to a teacher in service training is free speech. Okay, let me ask you this. Does it not become protected speech if, say, the boss says, we support this presidential candidate, that's going to be good for the city, I want all of you to go put a sign in your yard and wear a hat in support of that candidate. Does that make it protected speech because it was advocated for or given by a superior or the mayor? Well, there'd be questions about whether or not the boss could do that, okay? But if the boss did that, I think it would be following a boss's directive. So it wouldn't be protected speech? It wouldn't. If it's happening at work, and you're paid to be there, and you're within your general official duties, and you're reporting directly to your supervisor, all of these things happened in this case. Rodney Birch was doing his official duties. He wrote and proposed a strategic plan. Well, and that seems to be Ms. Casperson's argument, is there were disputed facts about how much of this was done with, you know, the directive of the mayor and how much was done on his own? Well, I don't think there are disputed facts. We've conceded those facts. Birch says that he worked with the mayor. He describes that multiple times about discussing options for a city administrator position. He was open with the mayor about that. In his June 1 memo, which is in the record, he outlines three options in process, three options and ways you can go about it. I think by Birch's own testimony, he is open that he discussed it with the mayor as part of his duties. He was paid to be there. He was on the clock. They were in the workspace, and he was reporting to his supervisor. But this isn't like a civil service position. I mean, we're not writing a job description for the street sweeper operator. I would expect that the job description of one of the highest-ranking officers of the city would be pretty vague and general as to what's within his wheelhouse. And if the mayor is not telling him, don't do this, then why is it improper for him to recommend a change in city structure to his direct supervisor, the mayor? It's really not improper. It is within his job duties. He can do that. I mean, how is that private speech? I'm having a hard time seeing Ms. Casperson's argument there. It's just not. It's official. That's public speech. He is discussing the way the government should function at the city of Chubbuck with his direct supervisor. He's consulting with HR, Scott Gummersall. He's talking to council members also about it and trying to form a decision about what would be best for the city. For the record, the mayor initially approved his proposal, right? I think he was open to it. And so did the council, but then nothing happened for several months to implement it. I think nothing happened because the mayor stepped back away from it, according to Birch. So you were trying to give us some cases or some things to look at in this, and frankly, I was being pretty direct with Ms. Casperson because I was looking for the same kind of factors, if you will. Was it made up his chain of command? Was it made to his chain of command? Was it within his chain of hallmark? That was the first. And then was it taken outside the workplace? It seems to me there are those cases where you're taking your speech outside the workplace. That'll make it private speech. That won't be public speech. So that's why I said that one. Was it within his responsibilities within the city? And Ms. Casperson directly corrected me and said that wasn't his job description. I said, well, it's within what he did on every other basis. He did strategic planning. He did that. So within his responsibilities. Did it contravene the directions of his supervisors? Those are the ones that I found in other cases which would say whether it was private speech or public speech. Are there any other you would add to that list? Those are the Dahlia factors, and the courts have looked at those a number of times. I can't think of one off the top of my head, but I think – Because Dahlia, I found them in Dahlia, and I found them in other places we've put Dahlia together, and that's why I came up with those for Ms. Casperson, and I'm asking you to help me now. If there's something else I need to think about here, where is it other than Dahlia? Well, I don't know if I can answer that one for Ms. Casperson. I'll let her do that. No, I mean for you. What other factors? Well, I don't think that there are. But what this court can look at is we're giving stricter scrutiny to private speech, and where are we finding that private speech? We are finding it, to your point, outside of the workplace. We're finding it in op-eds to the newspaper. Let's back up because, I mean, if Mr. Birch had written an op-ed to the newspaper advocating for a city administrator, would you agree that that was unprotected speech? Those are always hard questions because that's not what happened. But, yeah, that's getting closer. Absolutely. But under your theory, why would it? Because that would still be the mayor has given this apparent. I mean, in your view of the case, it seems to me, is the mayor has given him sort of agency to go and make the case for the city administrator position. And if that's true, then I don't understand why an op-ed to the newspaper would be different than going and arguing before the city council. It's different in this respect. When you're reporting to your supervisor, reporting back research ideas, construction of a plan, that's within what he's paying you to do. Now, if he pays you to do that and you also want to go out and write an op-ed under your own name in a publication, in a newspaper, for political purposes, it may almost be a dual role that you're doing both. Isn't that the same thing? He went to the city council and advocated, right? I mean, I'm not sure there's a difference between writing an op-ed in the newspaper and going to the city council. And the city council wasn't during his own time. I'm not even sure if there are. I mean, are there work hours? I mean, there's work restrictions. But after 5 p.m., does it matter whether the city council meeting was at 3 p.m. versus 8 p.m. at night? I don't think it does, no. And in this case, they're in the evening. But to your point, it is still something he did within his job duties. And when he does something within his job duties, he has to be subject to some oversight, some management, some criticism by his supervisor if his supervisor doesn't like the way that goes down. Why was that? How do we know that was within his job duties? Is there evidence that the mayor said go to the city council? Well, I don't think that there's evidence that he actually took the proposal of the city administrator position to the city council. It didn't get that far. It was presented at some point, right, because the council approved it. City administrator? No, they approved a strategic plan a few years earlier. In 2021, when Mr. Birch was considering moving to the city administrator position, he had proposed that to the mayor. He had discussed it with employees and city council members, but it never got to an actual vote before city council. So the mayor approved it orally but then changed his mind later. He was on board with the idea of it, said bring me some research on it. When it got right down to brass tacks, he said I don't support that, according to Birch, and then the idea died. And according to Birch, to your point, Birch then dropped it. He didn't continue to advocate for it. If he had, that would turn it into? If he had then said, you know what, my supervisor's told me no, but I'm going to go out in the public and I'm going to go after this because I believe it's the right thing to do, then, yes, that starts to become like private speech. Go ahead. Let me change the emphasis. I know these hypotheticals that you're getting. Let me change the emphasis. Does McDonnell Douglas play any part in this analysis, the McDonnell Douglas test? I haven't heard courts refer to it, but it's a similar burden-shifting approach. The McDonnell Douglas test is one where plaintiff has a certain burden to a certain point, and if they show that amount of evidence, then the government has to come back and say why it's not. And then the employee has to come back and say, well, that's pretext. That's pretext. The only reason I ask that is the district courts seem to follow that analysis in their decision. And I know that the McDonnell Douglas test applies in the IPPEA, but I don't know that it applies here. That's a good question, and I haven't heard the free speech decisions refer to it as the McDonnell Douglas burden-shifting approach. Well, to be fair, it's a retaliation doctrine. But I do think it applies. And we apply it all the time in retaliation cases. That's why I ask you the question. Yeah, absolutely. I get that. And the approach that the courts have articulated feels just like the McDonnell Douglas approach because the burden does shift to the employer to establish that we had, you know, under the balance of interest, a reason to take the action that we did that was non-pretextual. And so, yes. Let me ask you another question. As to the LROD policymaker exception that your opponent talks about, since the district court didn't have the occasion to weigh in and discuss this LROD policymaker exception, should we be talking about that? Well, I don't know. I think it applies to this case. Well, but the district court didn't even talk about it. Yeah, she didn't get to it. She didn't feel like it was necessary. Should we weigh in over the top of her? I don't think the court needs to. I think the court can affirm the decision the district court made, though I do think if this court looks at it, the policymaker exception should apply to this case. Rodney Burch wasn't a policymaking position. He was a department head. He consulted regularly with the mayor. And so when he's speaking out on items such as form of government, he is weighing in on policymaking-type decisions. Okay. And I questioned the council about, Ms. Casperson, about protected activity. And the reason I put it in the protected activity nature is because I have the IPPEA in front of me. And so I was trying to get into that before I got there, but just to say we're really talking about it. And under the IPPEA, we have a protected activity, but it's got to be a communication, right? Yes, absolutely. And what you're suggesting is that all these communications happened before the statute ran. Yes. There's nothing in the record that they can point to in these six months. And she says, no, quite the opposite. It was a continuing tort. That's a plaintiff's attorney's way of saying we can't identify anything. She's a dang good one. She is. But I'm just telling you, that's her argument. And what's your response back then? My response is that this court has to find something in the record that happened in the six months immediately preceding the lawsuit. And we're talking about the something meaning? Some reported activity of waste. Some communication in good faith. Isn't that what we're talking about? Yes, a report of waste and violation. The filing of the resignation. That wasn't one. That wasn't one. He resigned on March 3rd. He filed a written resignation on March 3rd saying my last day will be April 7th. On April 7th, he came in and listed a laundry list of things that he felt like was going wrong at the city. None of those, if you scrutinize them, are a report of waste or a violation of law. Right, but that falls within the 180 days. That would, yes. I was going to say the resignation would fall within the 180 days. Yes, it did. Okay. I see that I'm out of time if you don't have any other questions. Hey, Judge Smith can keep you up here as long as he wants. Thank you for taking time. We'll give you two minutes for rebuttal. Thank you, Your Honor. Just quickly, I want to address those value factors. And on the chain of command, I want to point you to 2ER293. And that is an email between the mayor and Birch. And the mayor says, how are we going to go forward? And Birch comes back and he says, you know, all of these things. But one of the things he says is that I will cease further private communications with the council about your performance. If he had a duty and they were in his chain of command, he cannot agree that he's not going to take things to people he's required to take things. And yet that's what he says. With regard to the official duties, the mayor testified that Birch did things all the time he was never asked to do, including the strategic plan. That seems to hurt your argument. I help you. Because if he did those all the time that he wasn't asked to do, that suggests he has more agency to act within his official duties outside of this narrow. I mean, let's say we don't accept your sort of narrow construct that the job description is the defining moment here. What is your best evidence of something that he did that was outside of his official duties that should make this protected speech? I think the best thing that we have are his private communications with individuals of the city council about proposing this city administrator position. And when did those happen? Did those happen after business hours? They happened before he met with the mayor to discuss it. Because that's what triggered should we try to get the mayor on board with this. Because he was concerned about the mayor's performance. He wasn't overseeing things. There was a lot of waste. There was a lot of loss of manpower. And that's what he was trying to address individually. But just to be clear, he never actually appeared before a city council meeting and advocated on this? Or did he? No, he did not. So it's just these private communications. These private communications. And then when he sends that email, he specifically says, I will stop doing those actions to try to get the mayor on board. With regard to the IPVEA, one of the things I want to correct there is that it's the adverse action that triggers the statute of limitations, not the communication. So that really gets us into. You think everything rolls in because the resignation was within, and it's a constructive. And it's a constructive discharge. And briefly, I wanted to talk about that constructive discharge because one of the. I'm not sure you're right about that though. Well, I guess this is a state law claim. So I guess I got to look at that a little closer. But under federal law, I don't think that you would be able to bring in things that happened, you know, outside of the statute of limitations just because the action itself. Oh, you're talking about the continuing action theory. Yeah. No, I'm just talking about. I think there was a suggestion that it's the communication that triggers when the statute of limitation begins to run. So we're looking now backwards. It's not. It's the adverse employment action. And that's what she ruled is that there was no evidence of any adverse action after February 23rd of 22, because she rejected the constructive discharge. Now, our argument was is that every time that he had directed financial decisions be taken away from him and every time that, you know, that policy decisions got taken to as a subordinate, these are actions. But the biggest thing about the case law doesn't support you on that, does it? On. On those constituting constructive discharge. The fact that you reduce an employee's responsibility. So not considered adverse. Well, I think what we have to look at is that aggravating factors and the totality of the circumstances. And that's where we really have a problem with what the district court said. Like, if you look at that case, it specifically says, well, that employee wasn't devoted. They weren't asked to resign or be fired. They weren't disciplined. And we have all of those things. You know, he was asked to resign twice. He was forced to go to an executive council meeting and attempted to be  After that, the mayor refused to meet with him. And then he, he appointed an interim public works director when Mr. Burge is still there. And then he continues to take work away from him. And our, our argument is those aggravating factors that this court has identified exist in this case. And if the court had considered those and the totality of the circumstances, that constructive discharge claim should have gone forward. Thank you. Thank you to both counsel for a well-argued case. The case is now submitted and that concludes our arguments for the day.
judges: TALLMAN, SMITH, NELSON